25CA2244 Peo in Interest of AP 07-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2244
Mesa County District Court No. 22JV68
Honorable Douglas S. Walker, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of Av.P., Ai.P., and Al.P., Children,

and Concerning J.J.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Welling and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 2, 2026

---

Todd M. Starr, County Attorney, John R. Rhoads, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Tara Jorfald, Office of Respondent Parents' Counsel, Lakewood, Colorado; Joel Pratt, Office of Respondent Parents' Counsel, Colorado Springs, Colorado, for Appellant

¶ 1     J.J. (mother) appeals the judgment terminating her parent-child legal relationships with Av.P., Ai.P., and Al.P. (the children). She contends that the juvenile court erred by (1) finding that the Mesa County Department of Human Services (the Department) made reasonable efforts to rehabilitate her and (2) admitting hearsay testimony at the termination hearing. We affirm.

## I.     Background

¶ 2     The Department opened a voluntary case for mother and the children — then aged five, three, and one — after receiving multiple referrals with concerns about the children's environment with mother. Among other things, there were reports that mother had left alcohol and cigarettes within the children's reach, claimed to have seen aliens in her home, and overdosed on medication. At first, the children remained with mother. But after mother told a therapist she could no longer care for the children, the Department placed the children in kinship care and created a safety plan.

¶ 3     The Department later filed a petition in dependency or neglect based on continued concerns about mother's mental health and failure to take her medication as prescribed. Mother entered a no contest plea to the injurious environment allegation in the petition,

1

and the juvenile court adjudicated the children dependent and neglected. The court then adopted a treatment plan for mother, which included a family time component that was "[c]ontingent on the recommendations of the parenting time assessment." The treatment plan was later amended to require mother to engage in child-parent psychotherapy and parent-child interactional therapy.

¶ 4 Six months after the petition was filed, the children were returned to mother, and she moved to Oklahoma with the children without permission from the court. While in Oklahoma, mother was placed on a psychiatric hold. The Department removed the children again and placed them in foster care in Colorado, where they remained for the rest of the case. Mother stayed in Oklahoma.

¶ 5 After the children returned to Colorado, the Department began providing supervised virtual family time, which the court later modified to therapeutic family time. Nearly a year later and about a year before the termination hearing, the court restricted family time, finding "that the kids [were] showing trauma around visits including outbursts and other behaviors." Although the court later lifted the suspension and ordered the Department to provide therapeutic family time, mother had no further family time.

2

¶ 6     More than two years after the petition in dependency or neglect was filed, the Department moved to terminate the parent-child legal relationships between mother and the children.  The juvenile court held a ten-day evidentiary hearing over three and a half months, after which it entered an order terminating mother's parental rights — three and a half years after the petition was filed.  As relevant to this appeal, the court found that the Department had made reasonable efforts to facilitate family time but that its attempts to set up family time were "thwarted by the children."

## II.     Reasonable Efforts

¶ 7     Mother contends that the juvenile court erred by finding that the Department made reasonable efforts because she did not receive adequate family time and therapeutic services.  We disagree.

### A.     Applicable Law and Standard of Review

¶ 8     To terminate a parent-child legal relationship, the juvenile court must find by clear and convincing evidence that (1) the child has been adjudicated dependent and neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is

unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable period of time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 9     In determining whether a parent is unfit, the court must consider whether a department of human services has made reasonable efforts to rehabilitate the parent. §§ 19-3-604(2)(h), 19-3-100.5(1), C.R.S. 2025. Reasonable efforts means the "exercise of diligence and care." § 19-1-103(114), C.R.S. 2025. This standard is satisfied by the provision of services in accordance with section 19-3-208, C.R.S. 2025, including, as relevant in this case, family time services. §§ 19-1-103(114), 19-3-208(2)(b)(IV).

¶ 10    In determining whether a department satisfied its reasonable efforts obligation, the juvenile court should consider whether the services were "appropriate to support the parent's treatment plan." *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). But it is the parent who is ultimately responsible for using those services to obtain the assistance needed to comply with the plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

¶ 11    Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the

court's factual findings for clear error but review de novo its legal determination based on those findings as to whether the department made reasonable efforts. *Id.* The credibility of the witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn from the evidence are all matters within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## B. Analysis

¶ 12    Mother first argues that the Department failed to make reasonable efforts to provide family time because she received no family time for long periods and the children were allowed to choose whether family time occurred. But the juvenile court found that the Department made substantial efforts to arrange family time and "rehabilitate the relationship between [the] children and mother." Notwithstanding those efforts, the children "steadfastly refused to have contact with [mother] for a least a year." The court explained that "[t]he fact that the services were unsuccessful does not render the Department's efforts unreasonable." And it concluded that the Department had made reasonable efforts to provide family time.

5

¶ 13    The record supports the juvenile court's findings.  The caseworker testified that the Department "tried hard over and over and over again for many months to get these visits to occur."  The caseworker's supervisor similarly testified that the Department "tried to do everything [it could] for these visits to take place."  For example, the Department communicated with the children to encourage visitation; communicated with "every party in the case" to arrange visits; "contracted with agencies to have these visits happen"; arranged transportation for the children and mother; and asked the children's therapist to prepare them for visits.

¶ 14    The children's therapist testified that she did "a substantial amount of work" and tried "lots of different things" to prepare the children for visits with mother.  She worked through "trauma narratives" with the children and attempted "various types of play therapy," "attachment work," and eye movement desensitization and reprocessing.  She also contacted other professionals for help, including visitation specialists and experts in reunification therapy.

¶ 15    But both the caseworker and the therapist testified that these efforts were unsuccessful in getting the children to attend family time.  The caseworker testified that the children refused to attend

family time, and the supervisor testified that they had "said for the last . . . two years that they do not want to see their mother." The therapist likewise testified that the children were "refusing to even show up" for visits and "expressed throughout . . . that they did not have a desire to visit with [mother]." Indeed, the therapist explained that when therapy began, the children were "absolutely not" able to "even tolerate . . . the sound of [mother's] name" and had a "very large trauma response." If they heard mother's name or anything that reminded them of her, "they would massively destroy property," scream "at the top of their lungs," and rip their hair out.

¶ 16 The therapist also testified that the children "were making great progress in their work with trauma," and that attempted family time with mother would be a "setback" in this work because "whenever visits [were] presented, there [was] a lot of regression from the [children]." She concluded that the attempts at family time were causing "trauma" and "harm" to the children.

¶ 17 A different therapist, an expert in child attachment and therapy who worked with the oldest child early in the case, testified that the child felt scared of mother and opined that forcing children to engage in a relationship under these circumstances would be

7

"re-traumatizing" and "an ongoing onslaught to their mental health." And a therapeutic visitation supervisor agreed that "it would do damage to the children to coerce them or otherwise make them feel tricked into participating in the visits with [mother]."

¶ 18 The caseworker's supervisor also testified that mother being out-of-state was an additional barrier that interfered with family time. To overcome this barrier, the Department "provided significant financial support" to help mother travel to Colorado for family time, including paying for her flights and hotel rooms. But although mother traveled to Colorado multiple times for scheduled family time, the children continued to refuse to visit mother.

¶ 19 This record supports the court's finding that the Department made reasonable efforts to arrange family time and that the breakdowns arose from factors beyond the Department's control.

¶ 20 Mother also contends that the Department did not make reasonable efforts to provide child-parent psychotherapy (CPP) and parent-child interactional therapy (PCIT). The juvenile court rejected this argument, finding that mother needed to be in Colorado for CPP and PCIT to be completed because "the treatments needed to be provided in a single state." The court also found that

the Department attempted to provide the services in Colorado, but that the services could not be provided without the children's cooperation — which it found "clearly . . . was not going to happen."

¶ 21    Again, the record supports these findings. The caseworker's supervisor testified that the Department attempted to authorize CPP, but that mother needed to live in Colorado to complete that therapy with the children. She also testified that the Department authorized PCIT, but mother needed to be in Colorado for that therapy as well. The caseworker explained that providers could not conduct the therapies "over state lines" because of a licensing issue.

¶ 22    The caseworker testified that the Department offered to help mother pay for a short-term rental so she could come to Colorado for "ninety days or so," to engage in these services. And at first, mother told the caseworker she would. But she later backtracked, saying "it wasn't a reasonable request at that time for her." The supervisor also testified that mother offered several times in court to move back to Colorado, only to retract her offer days later.

¶ 23    To the extent mother argues the Department should have modified her treatment plan earlier to add CPP and PCIT, she does not argue that her treatment plan was inappropriate. And as the

9

juvenile court explained, "all parties confirmed to the [c]ourt [at the termination hearing] that they believed that the treatment plan[] [was] appropriate." In any event, the court noted that "[t]he [j]udicial officers hearing this case over the past three years have expressly found that the treatment plan was appropriate," and the court "reaffirm[ed] that finding" in its termination order. Moreover, while mother laments the delay in adding CPP and PCIT, she had fourteen months after those components were added to the treatment plan to come to Colorado and complete that therapy.

¶ 24 Thus, because the record supports the juvenile court's findings, we discern no error in its conclusion that the Department made reasonable efforts to rehabilitate mother. *See A.S.L.*, ¶ 8.

### III. Hearsay

¶ 25 Mother next contends that the juvenile court reversibly erred by admitting hearsay testimony about statements one of the children made to the court appointed special advocate (CASA) under the excited utterance hearsay exception. We are not persuaded.

### A. Applicable Law and Standard of Review

¶ 26 Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove

the truth of the matter asserted." CRE 801(c). Hearsay is generally inadmissible unless an exception applies. CRE 802. Two such exceptions are an "excited utterance" and a statement of the declarant's then existing state of mind or emotion. CRE 803(2),(3).

¶ 27    We review a juvenile court's evidentiary rulings for an abuse of discretion. *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 32. A court abuses its discretion if it misapplies the law or if its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 28    An error is harmless, and is not a basis for reversal, when it "does not affect the substantial rights of the parties." C.R.C.P. 61. "An error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *People in Interest of C.C.*, 2022 COA 81, ¶ 20 (citation omitted).

## B.   Analysis

¶ 29    Mother identifies three categories of purported hearsay to which the CASA testified: (1) the child's statements about how she was feeling, including that she was "afraid," after being hospitalized

11

for a mental health incident;[1] (2) the child's angry call after a visit with mother did not happen, in which the child said she was "tired of being asked to visit" mother; and (3) a call from the child "in a rage," saying she had ripped up a letter her mother had written her.

¶ 30    We need not decide whether these statements were properly admitted because, even if they were not, any error would be harmless. The statements were brief and not a substantial focus of the CASA's testimony. *See People v. Salas*, 902 P.2d 398, 401 (Colo. App. 1994) (holding that testimony about child's statements was not unduly prejudicial where statements were "simple, brief, and contained no outrageous facts"). More importantly, they were cumulative of other admitted evidence that is not challenged on appeal. *See People v. Burgess*, 946 P.2d 565, 569 (Colo. App. 1997).

¶ 31    As detailed above, a substantial focus of the termination hearing was the children's emotional reactions to visits with mother and desire not to visit mother. This topic was explored extensively through the testimony of caseworkers, therapists, and family time

---

[1] Mother asserts that all the statements were admitted under the excited utterance exception. But the GAL argued at the termination hearing that the first statement was also admissible as a statement of the child's then existing mental state under CRE 803(3).

supervisors. Indeed, mother's own witness, a therapeutic family time supervisor, acknowledged that the children are "very against the idea of visits at this time." The CASA's testimony that the child said she was angry about the attempted visits and mother's attempt to contact her was not substantially different than other accounts of the children's emotional reactions and refusal to visit mother.

¶ 32    Given the admission of this other evidence, we cannot say that the challenged statements "substantially influenced the outcome of the case or impaired the basic fairness of the trial itself." *C.C.*, ¶ 20 (citation omitted). Thus, even if the statements were improperly admitted — an issue we do not decide — their admission did not affect mother's substantial rights, and reversal is not required.

## IV.    Disposition

¶ 33    The judgment is affirmed.

JUDGE WELLING and JUDGE LUM concur.